IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ELECTRONICALLY FILED
Apr 26 2017
U.S. DISTRICT COURT
Northern District of WV

TIMOTHY STRAHL,

    Plaintiff,

vs.

    : CIVIL ACTION NO. 5:17-CV-53 (Bailey)

JLE INDUSTRIES, LLC,

    : JURY DEMAND

    Defendant.

## COMPLAINT

Plaintiff, Timothy Strahl, (hereinafter Tim Strahl) for his Complaint against JLE Industries, LLC (hereinafter JLE) states for his Complaint as follows:

### A. NATURE OF CASE

1. This is an action to address a wrongful termination of employment in violation of the provisions of Service Transportation Assistance Act (hereinafter STAA) set forth in 49 U.S.C. § 31105.

### B. PARTIES

2. Plaintiff, Tim Strahl, is a citizen and resident of Marshall County, West Virginia.

3. Defendant JLE is a West Virginia Limited Liability Company that can be served at its designated office address listed with the West Virginia Secretary of State as 119 ICMI Road, Suite 210, Dunbar, PA 15431.

### C. JURISDICTION AND VENUE

4. Plaintiff filed an administrative Complaint against JLE with the Occupational Safety & Health Administration (hereinafter OSHA) on September 21, 2016.

5. OSHA acknowledged receipt of Plaintiff's Complaint by letter dated September 30, 2016. A true copy of OSHA's September 30, 2016, letter acknowledging the filing of Plaintiff's

Complaint with it is attached hereto as Exhibit A.

6. More than 210 days have elapsed since the filing of Plaintiff's OSHA's Complaint without the issuance of a final decision by OSHA.

7. The STAA, states, in part, as follows:

> (c) DE NOVO REVIEW. - With respect to a complaint under paragraph (1), if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury. 49 U.S.C. § 31105(c)

8. The delay of over 210 days and failing to issue a final decision by the Secretary of Labor regarding Tim Strahl's Complaint is not due to Tim Strahl's bad faith, giving this Court jurisdiction over this case pursuant to 49 U.S.C. § 31105(c).

9. Venue is proper in the District Court for the Northern District of West Virginia as substantially all of the events or omissions giving rise to the charged conduct occurred in this District.

### E. FACTS

10. Tim Strahl obtained employment with JLE at JLE's facilities in Marshall County, West Virginia in December 2015 as Inventory Manager.

11. JLE Energy Division's facilities in West Virginia included, but were not limited to, offices, a machine shop, an inspection shop, a pipe yard and an inventory staging area from which it provided services to customers related to oil and gas drilling.

12. While Tim Strahl was employed with JLE as its Inventory Manager, his office was

adjacent to the pipe yard and inventory staging area at the north end of the JLE property in Benwood, Marshall County, West Virginia.

13. As Inventory Manager, Tim Strahl had responsibilities for the yard, inventory, accuracy of the tubular data system (TDS), loading and truck drivers.

14. On or about July 16, 2016, Tim Strahl was given a promotion to "Floor Manager" and his office moved to a trailer at the south end of the JLE facility property, immediately south of the machine shop/inspection shop building.

15. It was impossible to view the pipe yard and inventory staging area at the north end of the JLE property from Tim Strahl's Floor Manager office due to the machine shop/inspection shop building being between Tim Strahl's Floor Manager office and the pipe yard and inventory staging area. See Exhibit B, a labeled ariel photograph of the JLE premises.

16. When Tim Strahl became the Floor Manager, his prior responsibilities as Inventory Manager having responsibility for the yard, inventory, accuracy of the tubular data system (TDS), loading and truck drivers became the responsibilities of the new Inventory Manager, Chris Williams.

17. Chris Williams had been the "Yard Lead" who reported to Tim Strahl when Tim Strahl was the Inventory Manager.

18. When Tim Strahl was the Inventory Manager for JLE, he had to sign a job description document.

19. Upon information and belief, Tim Strahl alleges that all personnel for JLE's Energy Division in West Virginia were required to sign job descriptions as it is a member of the American Petroleum Institute which has standards that require written job descriptions to be signed by all of its members' employees.

20. When Tim Strahl became Floor Manager there was no written job description yet written for him to sign. While Tim Strahl was Floor Manager he never signed a written job description for that position.

21. Chris Harris, JLE Energy Division's President, advised Tim Strahl that his duties were to assist the machine shop and inspection shop with the flow of material going in and out of the shops and to assist in tracking the product, mostly pipe and pipe fittings, for billing purposes.

22. A standard operating procedure (SOP-09-WI-11) at JLE while Tim Strahl was working was that when a new load of pipe was delivered to the yard, the Inventory Manager would receive the pipe under a standard operating procedure and once the pipe or other material was verified by the Inventory Manager, he would enter the existence of the material into a tubular data system (hereinafter TDS).

23. Once the material was in the computerized TDS, the General Manager, Stu Johnson, or Tim Strahl would create a work order utilizing the sales order which would verify the material to be shipped and the scope of work to be done.

24. The reason why Tim Strahl was creating work orders was so he could train the Machine Superintendent regarding the correct way to create the work orders.

25. Once the work orders were created and General Manager Stu Johnson authorized the material to come to the shop, the Inventory Manager would then assign a person from his yard crew to start bringing the pipe to the shop for work, mainly either to be inspected or machined and inspected. The standard operating procedure (SOP-09-WI-11) required that Inventory Manager had responsibility to enter all movement of the pipe into the TDS inventory system.

26. Although the responsibility for the Inventory Manager to have the material/pipe

brought to the shop was communicated to him by Tim Strahl, the General Manager, the Inspection Manager or the Machinist Superintendent, Tim Strahl was always to be informed by the other managers of the movement so that he would know to track the pipe/material in the shop via the TDS. Once the pipe/material was in the shop, Tim Strahl helped identify it to make sure that it was the correct pipe and went to the correct work station to be either inspected or machined and inspected, depending on the scope of the work.

27. When the pipe/material was ready to leave the machine shop/inspection shop, Tim Strahl, the General Manager, Inspection Manager or Machinist Superintendent would notify the Inventory Manager that the pipe was on its way back to the yard as the Inventory Manager then had the duty of placing it in the yard either to be stored, made ready to be sent out later or loaded for delivery. The standard operating procedure (SOP-09-WI-11) required that Inventory Manager had responsibility to enter all movement of the pipe into the TDS inventory system.

28. Once the pipe/material had left the shop area, Tim Strahl had the duty to assist in reviewing the reports of specific work done on the pipe/material, the number of pipes inspected or repaired and assisted in updating the work order so that it would be billed correctly, including correct amounts of thread protectors, collars and other materials used for the work order.

29. Tim Strahl also volunteered his assistance to help wherever he felt he could assist at JLE. When Inventory Manager Chris Williams was not at work, Tim Strahl would run the yard or inventory in Chris Williams' absence. When not standing in for Inventory Manager Chris Williams and in addition to doing his own Floor Manager duties, Tim Strahl would help JLE generally by cleaning connections on pipe, operating the loader, take caps off pipe before inspections, move office material from the office in Dunbar, PA to Benwood, WV, and even took out the trash.

30. On Friday, September 9, 2016, JLE received information from one of its customers that the customer had received five pieces of drill pipe more than they should have received. On Saturday, September 10, 2016, President Chris Harris telephoned Tim Strahl on his day off about reconciling the pipes in the yard with the TDS inventory system. During the conversation, Tim Strahl was advised that five pieces of pipe had been sent out to a drilling rig that should not have been sent out. Tim Strahl volunteered to come into the JLE facility to assist in determining the problem regarding the five pieces of pipe. When he arrived he assisted Inventory Manager Chris Harris and General Manager Stu Johnson. It was determined the actual count of pipes in the yard was not accurately reflected in the TDS inventory system. By review at the drivers' bills of lading it was determined that the wrong amount of pipe had been shipped from the yard.

31. On his regular workday, Monday morning, September 12, 2016, Tim Strahl had a discussion with President Chris Harris and obtained permission to work in the Inventory office that week to help reconcile the yard inventory and give additional training for inventory tracking on TDS. Tim Strahl trained Bobby Kins in TDS inventory to help track pipe and its movements through the yard, also training him how to pull reports from the inventory system to aid in constant reconciliation of the yard.

32.` Tim Strahl discussed with Inventory Manager Chris Williams the importance of following the work instructions in the SharePoint computer program to aid in his ability to track, receive and ship pipe correctly.

33. Tim Strahl had no involvement with the improper shipping of the five pipes that were investigated on September 10, 2016.

34. While working in the inventory office during the week of September 12, 2016, Tim

Strahl noted that the semi-tractors were being driven in the yard/inventory area and to the shop by employees that did not have commercial drivers' licenses (hereinafter CDL).

35. There had been an accident in the yard with the loader and Tim Strahl noted that the work in the yard was being done later in the day when the natural lighting failed to illuminate the yard that was not well lit.

36. Attached hereto as Exhibit C is a true copy of a September 17, 2016, at 9:44 a.m. email that Tim Strahl sent to President Chris Harris making a complaint that states, in part:

> Also, after the accident in the yard with the loader hitting something, I really do not feel comfortable with anyone moving a truck on property anymore that does not carry the proper credentials. My thinking is that if someone not trained to drive a semi has an accident in the yard then someone is going to be in trouble. I'm looking out for all of us on this one.

37. Tim Strahl's email to Chris Harris of September 17, 2016, at 9:44 a.m. was a complaint made in good faith pursuant to the STAA regulations as it was a written complaint to an employer pursuant to 29 CFR § 1978.101(g) made by an employee relating to commercial motor vehicle safety in the course of employment pursuant to 29 CFR § 1978.101(h).

38. Although the JLE facility contained a road between the yard and the machine/inspection shop that was all on private property, there were vehicles from other neighboring businesses, i.e., Level Tech and Mississippi Sand, which also used the road.

39. On Monday, September 19, 2016, another employee of JLE, Kenneth Suter, Jr., approached Tim Strahl, who had originally interviewed and hired Mr. Suter for a truck driver position at JLE when Tim Strahl was still Inventory Manager. Tim Strahl then became Mr. Suter's supervisor while Tim Strahl was the Inventory Manager. However, after Tim Strahl became Floor

Manager, Christina Murtaugh became in charge of trucking and was Mr. Suter's supervisor. Mr. Suter told Tim Strahl about an issue at JLE that occurred on Friday, September 16, 2016. Mr. Suter did not want to talk about the September 16, 2016, incident with his trucking supervisor Christina Murtaugh as she was aware of what had happened and did nothing to stop it.

40. Mr. Suter's incident of September 16, 2016, which he reported to Tim Strahl was that he was instructed by the JLE dispatcher, Doug Barnhart, to clock in on JLE's ADP Mobile App when he had shown up for work at 6:30 a.m. The customer at the well where Mr. Suter was to deliver material postponed the delivery time by three hours and the well was two and a half hours away from the Benwood, Marshall County, West Virginia JLE facility. Dispatcher Barnhart instructed Mr. Suter not to log in on PeopleNet, which is JLE's Department of Transportation (hereinafter DOT) regulated log for truck drivers as the delay in delivery made by the customer likely would require Mr. Suter to work more than the permissable 14 consecutive hours as set forth in DOT regulation 49 C.F.R. §395.3(a)(2).

41. The DOT regulations require that all hours that are on duty for a driver are to show on the logs. Mr. Suter was told not to show the approximate three hour wait for the start of the day on PeopleNet in order to lengthen his hours of legal driving service for the day as there was no one available to relieve him of duty after his total 14 hours of legal service for the day. The trucking supervisor Christina Murtaugh was present when Dispatcher Barnhart instructed Mr. Suter not to log onto PeopleNet. Another truck driver, Richard Nixon, was then also told not to log onto People Net and trucking supervisor Christina Murtaugh laughed, covered her ears with both hands and said, "I didn't hear that."

42. Kenneth Suter's day turned into a very long day and about 8:00 p.m., a half hour

before his 14 hours were up to legally drive a commercial vehicle, he called Dispatcher Barnhart and was instructed to continue to drive the empty tractor trailer to JLE in Benwood because Dispatcher Barnhart didn't have anyone to come and get the truck.

43. Kenneth Suter drove the truck back to the yard and finally logged off at about 11:00 p.m., 16-1/2 hours after he started work for the day.

44. Over the weekend Kenneth Suter thought about the ordeal and it upset him that Christina Murtaugh did not appear to have any problem breaking the federal motor vehicle carrier rules which put his CDL at risk. Kenneth Suter was in fear of retaliation if he complained to trucking supervisor Christina Murtaugh so instead he went to his old supervisor, Tim Strahl.

45. At about 5:00 p.m. Tim Strahl orally made the severe safety complaint to President Chris Harris of JLE's dispatcher requiring drivers to delay logging in the People Net system so they could work more than 14 hours, which trucking supervisor Christina Murtaugh permitted.

46. At about 7:00 p.m. President Chris Harris and JLE's Health, Safety, Security and Environment Manager Michael Spinneweber came to Tim Strahl's office and fired him.

47. JLE's firing/termination of Tim Strahl's employment violated the STAA, 49 U.S.C. § 31105(a)(1)(A)(I) which states, in part, as follows:

> A person may not discharge an employee, or discipline or discriminate against an employee regarding any pay, terms or privileges of employment because the employee, or another person at the employee's request has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or will testify in such a proceeding . .

48. A motivating factor in JLE's decision to fire Tim Strahl was in retaliation for him making the safety complaint of drivers moving trucks without having "proper credentials",i.e. CDL,

9

as stated in his email of September 17, 2016, attached hereto as Exhibit C.

49. A motivating factor in JLE's decision to fire Tim Strahl was in retaliation for him making the complaint of requiring drivers to delay in signing in on their drivers' log so they could work over 14 hours which he orally reported to President Chris Harris on September 19, 2016.

50. JLE's anticipated non-discriminatory/retaliatory reasons for terminating Tim Strahl's employment are false and pretextual.

51. JLE's anticipated non-discriminatory/retaliatory reason for Tim Strahl's termination, i.e. the mis-delivery of the five pieces of pipe on September 9, 2016, was not Tim Strahl's fault in any way.

52. Tim Strahl did not receive any corrective action or counseling expressly for the mis-delivery of the five pieces of pipe on September 9, 2016, and the Corrective Action form signed by President Chris Harris on September 19, 2016, attached hereto as Exhibit D, which references "multiple instances of missing inventory including inventory shipped to wrong location" is false and pretextual as it attributes those instances of missing inventory and mis-delivery to Floor Manager Tim Strahl, but to the contrary, the responsibility for the inventory and delivery was that of Inventory Manager Chris Williams, who received no discipline or less severe discipline than termination.

53. JLE's anticipated non-discriminatory/retaliatory reason for Tim Strahl's termination, i.e. he had received a prior warning of discussing company business with subordinates without permission, is false and a pretext.

54. The Corrective Action form for Tim Strahl's termination signed by President Chris Harris on September 19, 2016, states in part:

        Tim **continues** to have conversations with former direct reports that is making it difficult for the new manager to perform effectively. (Boldfaced underlined emphasis added.) See Exhibit D.

55. Tim Strahl had been given a Corrective Action form for an incident allegedly occurring on August 18, 2016, where he allegedly "disclosed to his subordinate, Andrew Cox, that Christina Murtaugh would be taking over transportation prior to the official announcement." See Exhibit E.

56. The August 18, 2016, Corrective Action form is the first and only time that Tim Strahl had been accused of improperly talking to subordinates.

57. President Chris Harris' handwritten statement on Exhibit D, the September 19, 2016, Corrective Action form, states that, "*Tim continues* to have conversations with former direct reports that is making it difficult for the new manager to perform effectively". (Italic emphasis added). President Chris Harris' labeling the event as "*Tim continues*" can only logically mean that there was a prior conversation between Tim Strahl and another subordinate/direct report. The only prior "conversation with a former direct report(s)" was the August 18, 2016, conversation with Andrew Cox related to Christina Murtaugh taking over transportation . Accordingly, the only way President Chris Harris could logically state that *"Tim continues to have conversations with former direct reports"* was by having conversation with another subordinate, i.e. driver Kenneth Suter, Jr., early on September 19, 2016, about violations of the DOT 14 hour working limit law, which Timothy Strahl reported to President Chris Harris at 5p.m., two hours before he was fired that same day, September 19, 2016, at 7 p.m.

58. JLE would not have fired Tim Strahl in the absence of his protected activity of making the written and/or oral complaints to President Chris Harris.

59. JLE disciplined Tim Strahl more severely, by firing him, than it treated Inventory Manager Chris Williams regarding the missing inventory and mis-delivery of September 9, 2016.

60. Tim Strahl made complaints to JLE regarding good faith concerns about violations of DOT regulations, whereas Inventory Manager Chris Williams had made no similar complaints to JLE.

### F. DAMAGES

61. As a direct and proximate result of Defendant's conduct, Tim Strahl has suffered the following injuries and is entitled to compensatory damages pursuant to 49 U.S.C. §31105(b)(3)(A)(iii) :

    a. Past and future loss of income,

    b. Past and future employment benefits, and

    c. Past and future emotional distress that may be inclusive of such states as fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal.

### G. PUNITIVE DAMAGES

62. Due to the intentional or retaliatory or malicious actions of JLE, Timothy Strahl is entitled to an award of punitive damages not to exceed $250,000.00 pursuant to 49 U.S.C. §31105(b)(3)( C).

### H. ATTORNEY FEES AND COSTS

63. Tim Strahl is entitled to an award of reasonable attorney fees, litigation costs and expert fees pursuant to 49 U.S.C. §31105(b)(3)(A)(iii) and 49 U.S.C. §31105(b)(3)(B) .

### I.  DEMAND FOR JURY

64. Plaintiff demands a trial by jury.

### I.  PRAYER

65. For all of the above reasons Tim Strahl prays for judgment against JLE for $500,000.00 comprised of compensatory damages, punitive damages, attorney fees, litigation costs, pre-judgment interest, post judgment interest and any other relief that may be available under the law.

Respectfully submitted,

*/s/ Ronald Wm. Kasserman*
Counsel for Plaintiff

Ronald Wm. Kasserman (WVSB #1958)
KASSERMAN LAW OFFICES, PLLC
94 - 14th Street
Wheeling, WV 26003
Telephone: (304) 218-2100
Fax: (304) 218-2102